**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

ROBERT D. CARTER
ADC #088351                                                                                          PLAINTIFF

V.                              CASE NO. 2:15-CV-00039 BSM/BD

CARL MCCREE, et al.                                                                           DEFENDANTS

**RECOMMENDED DISPOSITION**

**I.      Procedures for Filing Objections:**

This Recommended Disposition ("Recommendation") has been sent to Chief Judge Brian S. Miller. You may file written objections to this Recommendation. If you file objections, they must be specific and must include the factual or legal basis for your objection.

Your objections must be received in the office of the United States District Court Clerk within fourteen (14) days of this Recommendation.

If no objections are filed, Judge Miller can adopt this Recommendation without independently reviewing the record. By not objecting, you may also waive any right to appeal questions of fact.

**II.     Screening:**

Robert D. Carter, an Arkansas Department of Correction inmate who was housed for a time at the Detention Center in Marianna, Arkansas, filed this lawsuit pro se under 42 U.S.C. § 1983.  (Docket entry #2)  Mr. Carter claims that Detention Center employees

violated his rights during his arrest and acted with deliberate indifference to his medical needs while he was detained at the Detention Center. He sued Marianna Police Lieutenant Carl McCree; Marianna Police Chief Martin Wilson; and Marianna Mayor Jimmy Williams in both their individual and official capacities.

The Court dismissed all official-capacity claims but allowed Mr. Carter to proceed against the Defendants in their individual capacities. (#10) Defendants have now moved for summary judgment on all of Mr. Carter's claims against them. (#24) Mr. Carter also has filed a motion for summary judgment. (#34)

Based on the undisputed evidence in the record, the Defendants' motion for summary judgment (#24) should be GRANTED, and Mr. Carter's claims should be DISMISSED, with prejudice.

## III. Analysis:

### A. Standard

In a summary judgment, the court rules in favor of a party before trial. A moving party is entitled to summary judgment if the evidence shows that there is no genuine dispute as to any fact that is important to the outcome of the case. FED.R.CIV.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246, 106 S.Ct. 2505 (1986). If there are genuinely disputed facts that are important enough to matter, the Court views those facts in a light most favorable to the non-moving party, provided the record does not contradict the non-

moving party's version of the facts so as to render that version unacceptable to any reasonable juror. *O'Neil v. City of Iowa City, Iowa*, 496 F.3d 915, 917 (8th Cir. 2007).

    B.    Underlying Events

On September 8, 2012, Mr. Carter was struck by a vehicle, which resulted in a fracture to his elbow. (#26-2 at p.4) From September 8, 2012, through September 12, 2012, he was treated at the Forrest City Medical Center and the medical center in Memphis, Tennessee ("The Med"). (#26-3) On September 12, 2012, he was discharged from The Med with an orthopedic "slip"[1] and pain medication. Doctors at The Med instructed him to follow up with an orthopedic doctor the following day. (#26-3 at pp.10-12) On September 13, 2012, Mr. Carter was seen at the Lee County Co-op where he was prescribed additional pain medication and instructed to follow up with an orthopedic specialist. (#26-4 at p.2)

On October 1, 2012, the Marianna Police Department received a complaint involving Mr. Carter. Defendant Wilson, Defendant McCree, and Officer Byrd (not a party to this lawsuit) responded to the call. (#26-5 at p.3) According to the Defendants, neither recalls seeing Mr. Carter being handcuffed, but they concede that the incident report reflects that Officer Byrd handcuffed Mr. Carter. (#26-12 at p.1; #26-13 at p.1)

---

[1] In his deposition testimony, Mr. Carter described his orthopedic slip as including a soft cast that covered his elbow and a sling that went around his neck. (#26-1 at p.5)

In his deposition testimony, Mr. Carter testified that a female officer held the handcuffs behind his back while Defendant McCree handcuffed him. (#26-1 at p.8) For purposes of this motion, the Court will assume that Mr. Carter was handcuffed behind his back and that the Defendants observed this procedure.

During his arrest, Mr. Carter alleges, he informed both Defendant McCree and Defendant Wilson of the recent injury to his left arm. (#26-1 at p.6) Defendant Wilson does not recall Mr. Carter complaining about arm pain or requesting medical attention. (#26-13 at p.1) Defendant McCree recalls Mr. Carter generally complaining about his arm. (#26-12 at p.1) For purposes of deciding the pending summary motions, the Court will assume that Mr. Carter complained of pain during and after the arrest.

According to Mr. Carter's own testimony, due to previous encounters with Defendants, they likely did not believe that he was telling the truth regarding his recent surgery. In his deposition, Mr. Carter specifically conceded that, "[Defendant McCree] probably thought I was lying." (#26-1 at p.7)

Mr. Carter also conceded that he was wearing a jacket at all times during the arrest, so the Defendants could not see his sling or soft cast.[2] (#26-1 at p.7) Moreover, Mr. Carter testified that, based on the circumstances surrounding the arrest, the Defendants probably believed that he was armed and intended to fire his weapon. (#26-1

---

[2] Although it is unclear to the Court how Mr. Carter had his left arm through the sleeve of his jacket while wearing his sling inside his jacket, it appears to be undisputed that this was the case.

at p.8) In fact, when asked, "[s]o you think they thought you were going to shoot," Mr. Carter replied, "Yes, ma'am, they did." (#26-1 at p.8)

All parties agree that once Mr. Carter arrived at the Marianna Police Department and his jacket was removed, it was apparent that he was telling the truth about his arm, and the handcuffs were removed. (#26-1 at p.9) Mr. Carter undoubtedly complained of arm pain at some point after he arrived at the Police Department, and officials contacted Pafford's Ambulance Service. EMTs re-wrapped Mr. Carter's arm. (#26-6 at p.3)

While housed at the Detention Center, Mr. Carter alleges, he complained about arm pain to various jailers. (#26-1 at p.11) It is undisputed that each time that Mr. Carter complained, officials provided him with pain medication. He was not examined by a physician, however, during his ten-day detention. (#26-1 at p.11; #26-8 at pp.1-2)

Mr. Carter does not recall seeing either Defendant McCree or Defendant Wilson after he was booked into the Detention Center. (#26-1 at p.12) Furthermore, the only time Mr. Carter says that he either saw or spoke to Defendant Williams was upon his arrival at the Detention Center. (#26-1 at p.12) At that time, Defendant Williams informed Mr. Carter that they were going to "get him some help." (#26-1 at p.9)

On October 10, 2012, Detention Center officials noticed that Mr. Carter's arm appeared swollen. (#26-9 at p.1) As a result, they again contacted Pafford's Ambulance Service. (#26-9 at p.1) EMTs removed the wrap previously placed on Mr. Carter's arm and noted an immediate reduction in the swelling. (#26-10 at p.3) Because the EMTs

determined that Mr. Carter needed to be evaluated by a physician, Detention Center officials released Mr. Carter from custody, and the ambulance service transported him to the emergency room at the Forrest City Medical Center. (#26-10 at p.3)

When Mr. Carter arrived at the emergency room, he complained that he was out of oxycodone, his prescription pain medication, and explained that his pain was a ten on the familiar one-to-ten pain scale. (#26-11 at p.2) The evaluating physician offered to remove Mr. Carter's staples, but Mr. Carter refused. (#26-11 at p.5) The physician's clinical impressions were: post-operative pain, non-compliance, and drug-seeking behavior. (#26-11 at p.5) Medical personnel discharged Mr. Carter to his home. (#26-11 at p.5)

On January 12, 2013, Mr. Carter was again booked into the Detention Center. (#26-1 at p.15) Detention Center officials provided Mr. Carter with pain medication when requested. (#26-1 at p.16) He was released from custody on January 21, 2013, for a medical appointment. (#26-1 at p.16)

On January 22, 2013, Mr. Carter had his first post-operation appointment. (#26-3 at p.12) He was instructed to follow up with the Ortho Orange Clinic in six months. (#26-3 at p.12) Medical records do not indicate any further diagnoses, injury, exacerbation of a pre-existing injury, or aggravation of the left arm or elbow.

C.     Analysis

In determining whether an official was deliberately indifferent to an inmate's serious medical needs, courts must consider both objective and subjective factors. *Scott v. Benson*, 742 F.3d 335, 339-40 (8th Cir. 2014). First, was the inmate first suffering from an objectively serious medical need? See *id*. at 340. An objectively serious a medical need is one that has been "diagnosed by a physician as requiring treatment" or must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id*. (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)).

Second, is there evidence that the defendant "actually knew of but deliberately disregarded" the inmate's serious medical need? *Id*. This showing requires a mental state "akin to criminal recklessness." *Id*. (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Gross negligence is insufficient to establish deliberate indifference. *Fourte*, 746 F.3d at 387 (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)).

Here, Mr. Carter complains that he was improperly handcuffed behind his back during his arrest, causing him to sustain further injury to his left arm or elbow. He also claims that the Defendants denied him proper medical care while he was housed at the Detention Center between October 1 and October 10, 2012.

Defendants argue that Mr. Carter's claims fail as a matter of law because they were not aware of Mr. Carter's injury at the time of his arrest; nor were they responsible

for his being cuffed behind his back.  They also contend that Detention Center officials provided Mr. Carter with constitutionally adequate medical care.[3]  The Defendants also raise the defense of qualified immunity.

Viewing the facts in the light most favorable to Mr. Carter, the Court assumes that at the time of his arrest, he informed both Defendants McCree and Wilson that he was suffering from an injury to his left arm.  According to Mr. Carter's own testimony, however, the Defendants had reason to suspect that Mr. Carter was not telling them the truth.  Moreover, it is undisputed that Mr. Carter was wearing a jacket at all times during his arrest and transport to the Detention Center and that the Defendants could not see either the sling or the soft cast until he arrived at the Detention Center.  Importantly, Mr. Carter conceded that the arresting officers probably believed that he was armed and would fire his weapon.

In deciding whether a defendant is entitled to qualified immunity, the Court must determine whether the facts demonstrate a deprivation of a constitutional right and whether the implicated right was clearly established at the time of the alleged deprivation. *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2011) (citing *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)).

---

[3] Defendants dispute that Mr. Carter suffered from a serious medical need, but for purposes of this motion, the Court will assume that Mr. Carter's left-elbow injury constituted a serious medical need.

Here, based on the undisputed facts, there was no constitutional violation in the Defendants' failure to intervene when the Officer Byrd cuffed Mr. Carter behind his back, even if the Defendants knew that his arm was injured. Even if Mr. Carter had established that his constitutional rights were violated, no reasonable officer would have known that the cuffing Mr. Carter behind his back under these circumstances would violate his rights. "[A]n [official] does not lose his qualified immunity because of a mistaken, yet reasonable belief, nor does an [official] lose his immunity because of a reasonable mistake as to the legality of his actions." *McCoy v. City of Monticello*, 342 F.3d 842, 844 (8th Cir. 2003).

According to Mr. Carter's own testimony, the arresting officers, including Defendants McCree and Wilson, believed that Mr. Carter was armed and intended to fire his weapon; the officers could not see either the cast or the sling that Mr. Carter was wearing because they were covered by his jacket at all times during his arrest; the officers reasonably doubted that Mr. Carter was telling the truth because of his lengthy history with the Marianna Police Department; and Mr. Carter had previously been arrested for resisting arrest.   (#26-1 at p.8)

Based on these circumstances, it was reasonable for Mr. Carter to be handcuffed behind his back during his arrest and transport to the Detention Center, despite his protestation that he had recently undergone surgery on his left arm.  Defendants

immediately removed Mr. Carter's handcuffs from his left wrist when Mr. Carter's jacket was removed and revealed that he was telling the truth regarding his left-arm injury.

Likewise, Defendants did not provide Mr. Carter unconstitutionally inadequate medical care. It is undisputed that Defendants contacted an ambulance service so that Mr. Carter could be examined as soon as he was booked into the jail. EMTs treated his arm by re-wrapping his elbow.

Mr. Carter alleges that one of the examining EMTs stated that Mr. Carter needed to be examined by a physician, but the medical records do not support this allegation. Rather, according to Mr. Carter's medical records, EMTs re-wrapped his arm, and no further medical attention was necessary. (#26-1 at pp.9-10; #26-6 at p.3) Importantly, Mr. Carter's medical records reveal no indication of any further diagnosis, injury, exacerbation of a pre-existing injury, or aggravation of Mr. Carter's arm or elbow after his arrest.

Furthermore, the undisputed evidence shows that Mr. Carter received pain medication each time it was requested during the ten days he was incarcerated at the Detention Center. When Detention Center officials noticed that Mr. Carter's arm was swollen, they called the ambulance service so that Mr. Carter could be examined. When EMTs determined that Mr. Carter needed to be examined by a physician, Detention Center officials released Mr. Carter from custody.

It is undisputed that Mr. Carter did not have any further contact with any of the Defendants following his initial arrest and transport to the Detention Center. Mr. Carter specifically testified that he did not recall seeing any of the Defendants following the date that he was arrested. (#26-1 p.12) Finally, Mr. Carter explains that he believes that he would have suffered pain during the time that he was housed at the Detention Center, regardless of whether he was incarcerated. (#26-1 at p.13)

Based on the undisputed evidence, the Court cannot conclude that the Defendants acted with deliberate indifference to Mr. Carter's medical needs during the ten days that he was held in the Detention Center. Mr. Carter has failed to present any evidence showing that the Defendants' conduct approached "criminal recklessness." The Defendants are entitled to judgment as a matter of law.

### III. Conclusion:

The Court recommends that the Defendants' motion for summary judgment (#24) be GRANTED, and that Mr. Carter's claims be DISMISSED, with prejudice. Mr. Carter's motion for summary judgment (#34) should be DENIED, as moot.

DATED this 25th day of January, 2016.

_____
UNITED STATES MAGISTRATE JUDGE